**Opinion issued October 7, 2014**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-12-00200-CR**

_____

**LAJUAN CECILE BAILEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case No. 1298261**

**O P I N I O N**

A jury convicted appellant Lajuan Cecile Bailey of bail-jumping and failure

to appear. *See* TEX PENAL CODE ANN. § 38.10 (West Supp. 2014). It assessed

punishment at 10 years' confinement and a $10,000 fine. *See id.* § 12.34. In two

related issues, Bailey contends that she received ineffective assistance of counsel at

trial in connection with her lawyer's allegedly unauthorized waiver of the attorney-client communication privilege, and that the trial court erred in overruling her motion for mistrial on that basis.

To establish a claim of ineffective assistance of counsel on direct appeal, an affirmative demonstration of deficient attorney performance must be firmly founded in the record. Here, although Bailey contends that she did not consent to the waiver of privilege in connection with her trial counsel's cross-examination of her former lawyer, the trial judge expressly found that such a waiver in fact had occurred. Without the benefit of an evidentiary hearing on Bailey's allegations, the record is not sufficiently developed for us to conclude that the trial judge's determination was in error. Accordingly, we affirm the judgment.

**Background**

Lajuan Bailey was charged in 2009 with the felony offense of fraudulent use or possession of identifying information in Harris County.[1] She was charged with a separate instance of the same crime that same year in Jefferson County. In both cases, she was released from custody on bond pending trial.

---

[1] *See* Act of May 26, 2007, 80th Leg., R.S., ch. 1163, § 1, sec. 32.51, 2007 Tex. Gen. Laws 3991, 3992; Act of May 23, 2007, 80th Leg., R.S., ch. 1173, §§ 1, 2, sec. 32.51, 2007 Tex. Gen. Laws 4012 (current version at TEX. PENAL CODE ANN. § 32.51 (West Supp. 2014)).

Bailey hired attorney Brian Roberts to defend her in both cases. A pretrial conference was scheduled to be held in Harris County on September 7, 2010. Fearing that the hearing would preclude him from attending a friend's funeral, Roberts arranged to have the conference reset. On September 2, he informed Bailey that the hearing had been rescheduled to September 21.

On September 8, Bailey's bond was revoked in Harris County because a new charge had been filed against her in Brazoria County. The Brazoria County charge, felon in possession of a firearm, *see* TEX. PENAL CODE ANN. § 46.04(a) (West Supp. 2014), had been filed and a warrant had issued for Bailey's arrest in August 2010.

Bailey was scheduled to come to court in Jefferson County on September 15, but she did not appear. On September 21, she did not attend the rescheduled pretrial conference in Harris County. As a consequence, Roberts withdrew from representing her, Bailey's bond in Harris County was forfeited, and an alias capias was issued for her arrest. Bailey was ultimately indicted by a grand jury for bail-jumping and failure to appear. She hired a new attorney, Jeffrey Sasser, to defend her.

At trial on the bail-jumping charge, the State indicated its intention to call the original defense attorney, Roberts, as a witness to testify "about information regarding resets and information passed on by the defense attorney from the Court

to his client for purposes of showing up in court." Roberts informed the court that he had told the prosecuting attorney that he would not testify unless compelled to do so by the court. Accordingly, the State moved to compel his testimony.

The court heard argument on the motion the morning of the first day of trial. Roberts was present and asserted his unwillingness to divulge information relating to a former client unless ordered to do so by the court. The State argued that Roberts could be compelled to testify about his communication of court dates to Bailey, as the transmission of this information is exempt from the attorney–client communication privilege under the rule of *Austin v. State*, 934 S.W.2d 672 (Tex. Crim. App. 1996). The trial court agreed and granted the State's motion to compel.

On the first day of trial, the State called as witnesses Bailey's bondsman and several Harris County court employees, including the district court coordinator. The State relied on these witnesses to establish the basic facts supporting its case: Bailey was charged with a crime, she had been released on bond, she was obligated to appear in court on September 21, and she did not appear.

On the second day of trial, the State called Roberts to the stand, indicating that it intended to ask him questions about his representation of Bailey in the Jefferson County case. Defense attorney Sasser objected, arguing that any mention of Jefferson County and Bailey's failure to appear for trial in that case would be "highly prejudicial" and inadmissible under Rule 403. The State argued that the

4

evidence was admissible under Rule 404(b) in order to show motive or intent. The court ruled that Jefferson County should not be discussed unless the defense "opened the door."

Accordingly, throughout direct examination the State confined its questioning to the history of the Harris County matter. Roberts testified about the series of resets in the Harris County case. He explained that he requested the final reset because a close friend had died and there was a risk the funeral would coincide with the hearing. He sent a lawyer with whom he shared office space, Chip Lewis, to obtain the reset. He further confirmed that he had telephoned Bailey on September 2 and told her about the reset.

During cross-examination, Sasser initially asked questions critical of Roberts's handling of the reset. For example, he asked Roberts why he had sent another attorney to handle it and why he failed to consult with Bailey prior to rescheduling. Eventually, Sasser changed subjects to the Brazoria County charge, prompting further discussion of the attorney–client privilege:

| [Sasser]: | Do you remember having—I know this is real touchy because of the attorney-client privilege. For purposes of my questioning, if I ask you a question that invades attorney-client privilege, you can assume it's okay to answer. *I've talked to my client about this*. Okay? I want to go into specific conversations. I want to have my client— |
| [Prosecutor]: | Judge, may we approach. |

5

(Emphasis supplied.) At the bench, the prosecutor then stated: "I think for Mr. Roberts's protection, he's worried about going into this and he needs to hear that from the client outside the presence of the jury so that Mr. Roberts is comfortable that she is allowing him to answer the questions." The judge then excused the jury from the courtroom, and the discussion continued in Bailey's presence:

| | |
|---|---|
| Sasser: | Judge, at this time I anticipate asking Mr. Roberts about communications that he had with my client regarding the warrants that came up from Brazoria County. Not from Jefferson County, not from Beaumont. We already talked about this earlier, but the fact, you know, [the prosecutor] had come in here and gotten the bond revoked, she had these new cases in Brazoria County, I basically want to talk about the conversations he might have had with her about that and the fact— |
| The Court: | You discussed these with your client? |
| Sasser: | Yes, sir, I have. |
| The Court: | Alright. I will allow you to. |
| Sasser: | For my protection, may I get something on the record from my client? |
| The Court: | Any objection? |
| Prosecutor: | No, Judge. I think for Mr. Roberts, he needs to hear it out of Ms. Bailey's mouth that she's waiving the privilege between her and the attorney. |
| Sasser: | You just heard what I discussed with the judge. |
| The Defendant: | Only on one case. That's the only case that was because I had no other charges. There was only one case filed. |

6

Sasser: Are you waiving the attorney-client privilege by your prior attorney, Mr. Roberts, for me to question him regarding communications that you may have had with him around September 2nd, 2010 regarding your outstanding cases, the Brazoria cases?

The Defendant: Yes, one case.

The Court: All right. Anything further?

Prosecutor: Not unless Mr. Roberts has questions of his prior client or has concerns.

Sasser: I think it's clear she waived the privilege at this point. I'm offering Mr. Roberts the opportunity if he doesn't feel uncomfortable or doesn't need to make inquiries so we don't have to take the jury back out.

Mr. Roberts, do you think that's adequate for the attorney-client privilege for you to answer the questions unencumbered by attorney-client privilege you used to have with Ms. Bailey?

Roberts: I didn't quite hear what it is she's waiving. I don't feel comfortable testifying to anything unless I hear directly from her the particular privileged conversations that she's waiving her privilege to. Are you waiving privilege—

The Defendant: I'm only waiving privilege to the one case that was filed against me in Brazoria County during this time because everything did not happen at the same time. Do you understand what I'm saying?

Roberts: Correct.

The Defendant: There's only one thing that changed during the whole time I was on bond, that is the only thing that I'm talking about and referencing, not everything subsequent or after the fact.

7

Sasser: She had a gun case, the initial case filed in Brazoria County, felony possession of a gun. That was the warrant [the prosecutor] came in and showed you. I would assume. I wasn't here, Judge. She picked up this new case in Brazoria and you revoked her bond.

Roberts: That's the only thing. Nothing else. I understand.

The Defendant: Just only that.

When questioning resumed, Roberts confirmed that during September 2010, Bailey had an "open warrant" stemming from the Brazoria County charge. Sasser then asked Roberts whether he informed Bailey of the seriousness of the warrant and the need to present herself to authorities:

Q. Well, did you call her every day before the 21st telling her: Hey you need to turn yourself in, you could be arrested any time, even coming down to courtroom on the 21st you could be arrested; did you ever tell her that?

A. I'm sure that we had a conversation that if she has an outstanding warrant for arrest in either county when she appears here, these deputies will take her into custody.

. . . .

Q. And she would know she needs to appear in court, even if she didn't have an open warrant, the Court would issue a warrant for her arrest if she didn't appear? There was already a warrant for her arrest, so isn't the purpose of a bond, when you have your clients—you sign somebody up, don't you go through how important it is to show up in court?

A. Yes.

Q. You tell them: If you don't show up to court, your bond is going to be revoked, don't you?

8

A.     Yes.

Q.     Provided it's already been revoked, so what was the hammer—what was the hammer over her head to show up on the 21st, she was already going in custody, which is the same thing, could have happened on the 8th—excuse me—whenever the Brazoria County case was filed. You don't know when that is, you don't—

A.     I don't have that in front of me right now.

. . . .

Q.     You don't have a note of that in your file, you have a note of that when you made the phone call [informing Bailey of the reset]?

A.     No, I don't have a note of that, Mr. Sasser. She's still required to appear in court. Whether there's a warrant or not, she's required to appear.

Further questions followed, critically probing Roberts's investigation of the Brazoria County charges.

Sasser next turned to the motion to withdraw filed by Roberts in Harris County on September 21. After Roberts confirmed that he filed the motion to withdraw because he knew that Bailey would not be coming to court, Sasser asked how Roberts knew in advance that she was not going to appear. Roberts replied, "Y'all might want to approach on that one." A short discussion at the bench followed:

The Court:     What have you got?

Sasser:     Are you going to rule on Jefferson County?

9

| | |
|---|---|
| Prosecutor: | He's asked the question. You asked the question. I don't object. |
| Sasser: | That's fine. |
| The Court: | Fine. |

Sasser then resumed his questioning before the jury:

| | |
|---|---|
| Sasser: | The question is – the question is that he already had in the motion to withdraw the reason he was withdrawing is because she didn't show up for court. I'm asking: How did he know she wasn't going to show for court.<br><br>You can answer that. |
| Roberts: | Judge? |
| The Court: | You may. |
| Roberts: | Because she had another setting in Jefferson on September 15 and she informed me she had no intention of appearing in Jefferson County. I also received a phone call from . . . her co-defendant's mother, who told me the night before that she was not going to appear in court. |
| Sasser: | Okay. That who wasn't going to appear? |
| Roberts: | Ms. Bailey was not going to appear. |
| Sasser: | In Beaumont [i.e., Jefferson County]? |
| Roberts: | Correct. |

Sasser followed with a series of questions about Roberts's representation of Bailey in Jefferson County. He elicited testimony about Roberts's plans with Bailey to settle both her Harris County and Jefferson County charges together.

10

Roberts confirmed that the authorities in Jefferson County had been willing to accept a plea bargain whereby Bailey would serve six months in jail. However, Roberts had been unable to negotiate a comparable agreement with Harris County officials in order to reach a final resolution to both cases. In this regard, Sasser then asked:

> Q. And you've been working hard to that end, correct?
>
> A. Correct.
>
> Q. In fact, my client [Bailey] had actually met with the prosecutor and talked with the prosecutor and investigators, correct?
>
> A. She did.
>
> Q. Okay. So, she was doing her part, wouldn't you agree, to get whatever you were trying to do in her case. I mean, she was cooperating?
>
> A. That's –
>
> Q. Open for debate?
>
> A. Well, she did cooperate. The cooperation was not long after I was retained on the case. If you're asking me about later, you might—I don't know how—what exactly it is that you're asking. I don't know how to answer.
>
> Q. We'll get through this. It's all out right now. The jury is going to hear about everything. *Don't worry about the attorney-client. Everything has been waived at this point.*

(Emphasis supplied). Sasser's subsequent questions attempted to connect the threat of arrest posed by the Brazoria County warrants with the continuing efforts to reach a negotiated resolution of the charges in Harris and Jefferson Counties.

The exchange between defense attorney and former-attorney witness apparently became heated when Sasser asked questions suggesting that Roberts, along with his office-mate Lewis, had been demanding higher fees of Bailey in the wake of the Brazoria County charges:

Sasser: Basically, weren't you telling her she needed to come up with the money you wanted for trial – you were set for trial, if you came up with this money, you would take care of all the problems?

Roberts: No. That was not the nature of the conversation. Tread lightly if you accuse me of something.

Sasser: Excuse me. I'd ask the witness not to argue with me. I'm just doing my job. I'm conducting cross-examination. That's all I'm doing.

Roberts: I understand that, but if there's an implication of some kind of wrongdoing, Mr. Sasser, you had better be either –

Sasser: So, I'm extremely clear –

The Court: Are y'all –

Sasser: I'm extremely clear about what my client told me –

The Court: Just a minute. Go with your questioning. Only your questioning.

Sasser: Isn't it true in this meeting you had in your office that, basically, the subject of it was, look, you need to get this money, you've got lots of problems, Ms. Bailey, you've got problems in Brazoria County, still got an outstanding case in Beaumont, got the case in Houston, you need to come up with some more money to take care of this, do a no-arrest bond? You never told her that?

Roberts: That is not correct. If she wanted to hire us on the Brazoria County case, yes, that's what the discussion was. There was not a discussion for her to give me more money over and above what the contract stated for her Beaumont case and Harris County case, that is not correct.

Sasser: So, you didn't – $7500, that's in your contract?

Roberts: Correct. That is the trial fee for the Jefferson County case and this case.

Sasser: And do you have a copy of that contract we can have?

Roberts: That's up to the client if she wants to release that.

(Pause)

(Off-the-record discussion between attorney and defendant)

The Court: Are we ready to proceed or not?

Sasser: Yes, sir.

Thus Roberts denied attempting to charge Bailey more for the cases he had been retained to handle in Jefferson and Harris Counties, and he also explained that Lewis did offer to defend her against the fresh charges in Brazoria County for an additional fee.

Sasser eventually asked Roberts whether he warned Bailey that she would be "making a huge mistake" by not appearing and forsaking the opportunity for the plea bargains he had been negotiating. Roberts replied that on September 14 he had emailed, texted, and called Bailey to advise her of what would happen if she did not come to court in Jefferson County. Sasser asked whether Roberts had "that"

13

with him, and Roberts confirmed that he did. At that point, the transcript indicates another "[o]ff-the-record discussion between attorney and defendant."

At Sasser's request, Roberts then read from his email to Bailey:

Roberts: . . . Chip informed me . . . you do not plan on appearing in court at Jefferson County. . . . I strongly advise you to appear in court. You will only make your situation worse by not appearing in court. The likely result, your bond will be revoked, D.A. file a bond jumping charge, which is a third degree felony. Also, necessarily complicates your Harris County case. Again, I'm advising you to appear in court tomorrow.

Roberts further testified that Bailey called him in response to this message. The cross-examination continued:

Sasser: Okay. When she told you that she wasn't going to Beaumont, did you – did you try to call her and convince her that she needed to you? [*sic*]

Roberts: How much more calling and convincing can I do besides an e-mail, text, and phone conversation that lasted 30 minutes?

Sasser: Do you have those records with you?

Roberts: I have them right here.

Sasser: I'd like to see them.

Roberts: Judge, this contains my handwritten notes, which may be privileged. If she'd like to waive that.

Sasser: This is your handwritten notes?

Roberts: No. Those are my handwritten notes on an e-mail I sent to her.

Sasser: You actually have the e-mail. Did you print that out?

Roberts: That's what those notes are.

Sasser: Thank you.

The prosecutor then asked to approach, and the record indicates the following:

(At the Bench, on the record)

The Court: We're right back where we started.

(Off-the-record discussion between attorney and defendant)

The Court: Sir, what do you need?

Prosecutor: Judge, it's not an objection. I just want to get it on the record, because it may not be clear on the record, that Mr. Roberts provided you with a document that Mr. Sasser is going to look at. Previous to Mr. Sasser getting it, you ordered the clerk to make a copy. Handwritten notes – as a protection of Mr. Roberts attorney-client privilege revealed. I just want to be clear on the record.

The Court: All right. Let the record so reflect.

Sasser: May I take a look at them?

The Court: They're coming right back in a minute, as soon as I get them back.

(Pause)

(Open court, defendant and jury present)

The Court: We're going to take a 10-minute break. Please go back there for a few minutes.

(Recess)

(Open court, no jury, defendant present)

15

The Court:     Let's get on the record and take care of the matter of the privilege. I understand that we have opened the door, we have come into both the Jefferson County charges and the Brazoria County charges, along with the charge here. Is that your understanding.

Prosecutor:    Obviously during the testimony Mr. Sasser asked about it, Judge. And Mr. Sasser said very clearly on the record his client waived the privilege before Mr. Roberts answered the question. However, out of an abundance of caution and to make it abundantly clear for the record, I think the Court ought to hear from the defendant that Mr. Sasser was correct, she waived her privilege also as to the Jefferson County transactions.

The Defendant: Am I allowed—I do have a problem. I was very specific in saying that I wanted to stick to the Brazoria County charge. I was very, very specific in the very beginning. And I don't know if I can stand up and object to something because I've never gone to trial before, which is why I was very specific about it in the first place. And because I do know, like, he argued—

The Court:     Okay. We understand. Do you have anything to add?

Sasser:        No, sir.

The Court:     I think the door has been opened as to both charges. They will come in.

Roberts:       I do have an issue with it. Mr. Sasser did clearly say: It's okay, the privilege—my client has waived privilege on that.

The Court:     It's not his privilege. It's your client's privilege— former client's privilege. Anything further?

Roberts:       Judge, if she's—*it's my understanding that she advised her lawyer while at counsel table the*

16

*privilege is waived.* If she's not waiving that privilege, I can't testify any further to anything on the Jefferson County case.

Prosecutor: Judge, I also do have something to add on the record. Mr. Sasser went into a series of questions regarding the Jefferson County case after he announced to the witness, to the Court, to the jury, to the prosecutor that his client had waived the privilege. In my opinion, making it very clear his client had waived privilege during the course of questioning, which lasted several minutes. The defendant was not making any attempt to get her attorney to stop asking questions about the Jefferson County case. *As a matter of fact, it was clearly obvious to me she could have simply—for purposes of the record, the entire time she's been communicating in writing and orally with her lawyer.* Very clearly, she's sitting right next to him. I did not see her try to get Mr. Sasser to stop asking questions at any time regarding the Jefferson County case. She could have clearly stopped Mr. Sasser from asking questions in that regard if she wanted to assert any type of privilege. Clearly, Mr. Sasser is asking the questions in an attempt to help her be defended in this case.

The Defendant: Can I say something at this point? See, that's what I'm saying.

The Court: No. No.

Sasser: May I respond, Your Honor?

The Court: You may.

Sasser: *It's true we were talking during the questioning*, but in fairness to my client, she did—she did write a note here: We can deal with this without bringing in Jefferson County. Just in response to [the prosecutor's] comment, she did write that down. I am her attorney and I did say that, but I think Mr. Roberts

17

is right, I don't think I can—I don't think I can waive her privilege. I think she has to do that. By me stating that, I certainly think I overstepped my bounds on that by—

Roberts:    I was led to believe she did waive the privilege, which puts me in a precarious spot.

Prosecutor: I do assert the defendant could have simply told her lawyer: I'm asserting the privilege. She never did that. *It was very clear to everybody in the courtroom, Mr. Sasser, she's waiving the privilege.* As you pointed out, Judge, it's the defendant's privilege and she did not assert it.

The Court:  Anything further?

Sasser:     I mean, she's talking to me. I don't know exactly what to tell the Court. She's telling me she did—

The Court:  I'll give you two minutes. Talk to your client right now.

Sasser:     Judge, the defendant basically has just advised me she didn't realize she had the right to do that, the right to disrupt the proceedings or speak out like that, and that if she had known she could have, she would have.

Prosecutor: *Clearly, the defendant was talking to her lawyer the entire trial.* We're not talking about disrupting the proceedings. The defendant could have whispered in the defense attorney's ear or written pages of notes in this entire trial. She did not do that when she heard her attorney waive the privilege or announce the privilege waived. It's her obligation to assert the privilege and she did not do that.

. . . .

Roberts:    Judge, I'm not sure if Ms. Bailey is now saying she's asserting her privilege. I can't testify further with

18

regard to Jefferson County, so I don't know how Mr. Sasser wants to handle this.

Prosecutor: How is the State supposed to handle testimony by Jefferson County since it's already been brought out on direct?

. . . .

The Court: It's obviously in the record. The question is: Will he be able to continue to testify?

Roberts: I don't think I can. I was led to believe Ms. Bailey waived her privilege to—the Jefferson County privilege. She's saying she didn't. I cannot testify any further on Jefferson County.

Prosecutor: I'm not saying that I would ask him any additional questions. I'm not proposing Mr. Sasser ask any additional questions out of an abundance of caution. My assertion is I would like it very clear it's the defendant's privilege to assert. The defendant did not assert the privilege after she heard the attorney tell Mr. Roberts the privilege was waived, which gave Mr. Roberts the opinion that the defendant waived the privilege. Therefore, the privilege is waived in effect. And out of an abundance of caution, I don't think we should talk about anything in Jefferson County, only things in the record, but *the defendant has waived her privilege*.

The Court: That is the ruling I'm going to make as soon as we get back from lunch.

. . . .

Prosecutor: You said you would make an official ruling regarding the privileged matter.

The Court: I don't think it's privileged anymore.

19

| Prosecutor: | *You believe the defendant has waived her privilege?* |
| The Court: | *I do.* |

(Emphasis supplied.) When trial resumed the next day, the parties continued to debate the privilege issue:

| Sasser: | Your honor, yesterday when we broke—before we broke, I had basically—I was cross-examining Brian Roberts, an attorney called by the prosecution. And before he testified, we had approached—just to kind of recap chronologically what happened yesterday morning before he testified—we approached John, the prosecutor, in an attempt to get in some confidential communications. He was going to try to get in some confidential communications. You ruled those in-camera and ruled those were admissible and the testimony regarding his representation of my client went forward. In that questioning, it also became apparent to me that my client wanted to waive the attorney-client privilege in regard to a particular issue. That issue was the open case in Brazoria County. And she specifically, on the record, got up and waived her privilege to those matters only. When I was cross-examining the witness, I improperly demanded that the witness—or kept insisting that the witness answer a question that violated—that the answer violated the attorney–client privilege in regards to an issue other than the Brazoria County case. During the exchange with the—with Mr. Roberts, my client was attempting to tell me something, but because I was in the heat of questioning, I was intent on the questioning, I wasn't listening to her intently. She did make a note on this pad. She was making notes asking: We can deal with this without bringing in Jefferson County at all, correct? And I didn't see that until after I had already gotten Mr. Roberts to answer that question. |

That being said, I went home and did research and it's my opinion, pursuant to Rule 503, that the defendant holds the privilege and that she is the only person that can waive that privilege. I don't have the authority to waive that privilege. I know that I—on the record and during the course of my questioning of Mr. Roberts, I know I stated that she had waived the privilege and he can answer the question. I certainly don't blame him for doing that, but it was improper for me to say that, I think. After speaking with her at the jail, I know it was against her wishes.

Therefore, because of the privileged communications that came in to the jury, I feel that she's been prejudiced to an extent that it requires a mistrial. Therefore, I'm making a Motion for Mistrial. I know it's unusual for a party that created it, the mistake, to ask for a mistrial. However, in this case, *I think the Court is clear—or should be clear that I didn't do it intentionally. I certainly wasn't trying to set up a scenario where a mistrial would be granted.* Nevertheless, because of the way things unfolded yesterday, I think that—first of all, that if the Court doesn't grant the mistrial, we should not continue any more confidential communications that might have occurred between my client and Mr. Roberts. And if you don't grant the mistrial, that the portion that was read into the record be stricken from the record and that the jury be asked to not consider that as evidence in this case.

Prosecutor:       Judge, I believe that Mr. Sasser's assertions have changed a small amount from yesterday in that he is telling us now that his client did assert her privilege after—subsequently to him announcing to the Court, to the witness, to the State that the privilege had been waived. I don't recall that being said yesterday. And *I would testify, if I were on the stand at any point, that the defendant has been communicating continually with her lawyer via writing and spoken word this*

21

*entire trial. Observations from this distance is that there are pages of notes she's written to her lawyer.* And the note that the lawyer—that Mr. Sasser just read was simply a question: Can we do this without getting into Jefferson County? That's not an assertion of anything. That's a question.

She heard her client—or her heard her lawyer waive her privilege and say that her privilege was being waived, just like everybody else did. And she sat there for a series of questions—not one or two or three, an entire topic—and failed to assert her privilege. She, obviously, believed, because she's an intelligent person who's been communicating with her lawyer the entire trial, this was effective for her defense.

I think the Court will remember from yesterday that a substantial portion of the cross-examination that occurred later were basically accusations against Mr. Roberts that he was not communicating sufficiently with his client, that he did not communicate the court date to his client, which would have been not illegal, but improper. That he was trying to bilk additional money or Mr. Lewis was trying to bilk additional money out of the defendant based on her situation she had gotten herself into by the time Jefferson County was brought up. Mr. Sasser, through his cross-examination – and we all understand he was doing his best in cross-examination for his client's interest – had started to imply, if not directly accuse via the questioning, that Mr. Roberts had done something improper. That automatically would have freed Mr. Roberts up, regardless of what this defendant wanted to happen, to talk about privileged communications in order to defend himself. I believe that part of the law is very clear.

So, there are a few reasons that the Court should not grant a mistrial and a few reasons why the information that was gone into was not privileged. Number one,

they were accusing Mr. Roberts of something, therefore, the privilege disappears so he can defend himself. Number two, it was brought up by the defense as a contemplated part of their defense. Number three, the defendant did not assert her privilege after hearing her lawyer say: The privilege is waived, go ahead and answer the question. And she very easily could have done that over the long period of time at some point, Judge.

. . . .

(Emphasis supplied.) The trial court denied the motion to strike and the motion for mistrial.

After the court's ruling on his motions, Sasser briefly continued his cross-examination of Roberts. He elicited testimony that although Roberts had called, texted, and emailed Bailey admonishing her to appear in Jefferson County the day before her scheduled appearance, he did not repeat these communications in regard to Harris County. In phrasing his questions, Sasser emphasized that Bailey's bond had been revoked in Harris County prior to her scheduled appearance on September 21, whereas in Jefferson County, Bailey's bond had not been revoked prior to her failure to appear there on September 15.

Once the State rested, the defense called Bailey to the stand. Bailey emphasized that she had not wanted to be taken into custody on the Brazoria County warrants because she wanted the opportunity "to take care of everything" and have her "fair day in court." She also discussed meetings in which Roberts's

officemate, Lewis, offered to defend her against the Brazoria County charge for $30,000. According to Bailey, in addition to allowing Roberts to attend a funeral, the rescheduling of the Harris County hearing also served the purpose of giving her "more time out there in the free world to get money together to give attorneys." She thus testified that she did not appear in Jefferson County because she "wasn't prepared" for her bond revocation in Harris County, and she was under the "impression" that her attorney's "plan" was to consolidate and resolve all of the pending charges. When Bailey was asked why she did not appear in Harris County on September 21, she answered, "Because according to the agreement I had on the bail agreement, my bond was revoked." Bailey went on to explain that she had a background in real estate, was familiar with contracts, and thought that her contract and further obligation to appear had been "voided out" by the revocation of her bond on September 8. After Bailey gave her testimony, the defense called the bondsman, who confirmed that the bond had been revoked on September 8, and that from "the 8th to the 21st she had no bond."

In his closing argument, Sasser admitted that Bailey had failed to appear but argued that the jury should acquit her because she had a reasonable excuse.[2] He

---

[2]     The jury charge contained an instruction on the defense of reasonable excuse that specifically addressed Bailey's claim that she had believed the revocation of her Harris County bond on September 8 relieved her of the

24

contrasted Bailey's situation in Jefferson County, where her bond had not been revoked, and her circumstances in Harris County, where bond had been revoked prior to her scheduled appearance. He noted that Roberts had specifically warned Bailey to appear in Jefferson County, but he had not so warned her with respect to Harris County. He also argued that the bondsman had shared her belief that revocation of her bond on September 8 had ended her obligation to appear on September 21. Finally, he emphasized Bailey's desire to remain free from custody so that she could gather money to hire Lewis as her attorney in Brazoria County and consummate her plans with Roberts to resolve the Jefferson County and Harris County charges together.

The jury found Bailey guilty, and after a hearing on punishment, imposed a fine of $10,000 and a prison sentence of ten years. The judge entered judgment on the jury's verdict. Bailey filed notice of appeal and Sasser moved to withdraw on February 21, 2012. On the same document, Bailey represented to the court that she was indigent, and she asked the court to immediately appoint appellate counsel to represent her, order a free record be provided, and set bail. The court conducted a hearing and on February 22, 2012 signed the following order:

---

obligation to attend court on September 21. *See* TEX PENAL CODE ANN. § 38.10(c).

25



**ORDER**

On _022212_ the Court conducted a hearing and **FINDS** that defendant / appellant

☐ **IS NOT** indigent at this time.

☑ **IS** indigent for the purpose of

    ☑ employing counsel

    ☑ paying for a clerk's and court reporter's record.

    ☑ employing counsel or paying for a clerk's and court reporter's record.

The Court **ORDERS** that

    ☑ Counsel's motion to withdraw is **GRANTED** / **DENIED**.

    ☑ Defendant / appellant's motion (to be found indigent) is **DENIED**.

    ☑ Defendant's / appellant's motion is **GRANTED** and

        ☑ _____(attorney's name & bar card number) is **APPOINTED** to represent defendant / appellant on appeal.

        ☑ The **COURT REPORTER** is **ORDERED** to prepare and file the reporter's record without charge to defendant / appellant.

**BAIL IS:**

    ☑ **SET** at $ 25,000.00

    ☐ **TO CONTINUE** as presently set.

    ☐ **DENIED** and is **SET** at **NO BOND**. (Felony Only)

In summary, the trial court:

- found that Bailey was indigent for the purpose of employing counsel;
- granted Sasser's motion to withdraw;
- denied the motion to find Bailey indigent (despite having previously so found); and
- purported to grant the motion to appoint appellate counsel; yet
- left blank the line on which the appointed appellate counsel would have been named.

No motion was filed to clarify or correct the February 22, 2012 order, nor were any other post-judgment motions filed. On April 25, 2012, this court abated the appeal and remanded the case for appointment of counsel. Even then, an

appellate attorney was not appointed until September 5, 2012, when the Harris County Public Defender's office appeared in the trial court.[3]

## Analysis

Bailey argues that she received ineffective assistance of counsel, but only based upon Sasser's questions which elicited testimony about attorney-client communications. In the alternative, Bailey contends that the trial court erred by denying her motion for mistrial on the basis of the alleged privilege violation.

### I. Ineffective assistance of counsel

Claims that a defendant received ineffective assistance of counsel are governed by the standard announced by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *Strickland* mandates a two-part test: (1) whether the attorney's performance was deficient, i.e., did counsel make errors so serious that he or she was not functioning as the

---

[3] We note that through no apparent fault of her own, Bailey apparently lacked any appointed counsel from February 22, 2012 to September 5, 2012. Generally, a motion for new trial must be filed no later than 30 days after the trial court imposes sentence in open court. TEX. R. APP. P. 21.4. As such, the deadline for filing a motion for new trial lapsed during the time when Bailey apparently lacked any assistance of counsel. Once appointed, appellate counsel had no opportunity to raise her claims of ineffective assistance of counsel by motion for new trial, a procedure which would have permitted an evidentiary hearing "to consider the facts, circumstances, and rationale behind counsel's actions . . . ." *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999).

"counsel" guaranteed by the Sixth Amendment; and if so, (2) whether that deficient performance prejudiced the party's defense. 466 U.S. 668, 687, 104 S. Ct. 2052, 2064.

The adequacy of attorney performance is judged against what is reasonable considering prevailing professional norms. *Id.* at 688, 104 S. Ct. at 2065. There is a presumption that, considering the circumstances, a lawyer's choices were reasonably professional and motivated by sound trial strategy. *Id.* at 689, 104 S. Ct. at 2065. In the face of this presumption, a criminal defendant has the burden of showing by a preponderance of the evidence that his attorney failed to provide reasonably effective assistance. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). Limitations of the record often render a direct appeal ineffective to adequately raise a claim of ineffective assistance of counsel. *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Critically, "[a]n ineffective-assistance claim must be firmly founded in the record and the record must affirmatively demonstrate the meritorious nature of the claim." *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012); *see also Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). That necessary firm foundation is lacking in this direct appeal.

Bailey contends that while she waived privilege with regard to charges against her in Brazoria County, she specifically excluded the Jefferson County

28

charges from the scope of her waiver. She contends that "the evidence shows that trial counsel's breach of the attorney-client privilege was without consent." The evidence includes her explicit statements on the record that came before and after the cross-examination at issue. *Before* her former attorney began answering questions about their communications, Bailey stated in open court that she was confining her consent to communications about only one case—the Brazoria County charges. Then, *after* her trial attorney's extensive questioning about communications relating to the Jefferson County charge, she later reiterated that she previously had been "very specific in saying" that she "wanted to stick to the Brazoria County charge." Moreover, according to Bailey's trial counsel, in the midst of the questioning she wrote him a note that said: "We can deal with this without bringing in Jefferson County." Based on this information and the principle that the privilege belongs to the client, that trial lawyer subsequently "fell on his sword" and admitted his instructions to the witness about the scope of the waiver were "improper."

We acknowledge that this evidence is substantial, but nevertheless it is not conclusive as to an absence of waiver, particularly in light of the trial court's ruling to the contrary. Bailey's depiction of the record is materially incomplete in its failure to acknowledge and address the totality of the circumstances and the

29

reasonable inferences therefrom, including other aspects of the record that do suggest a waiver of the privilege, her statements on the record notwithstanding.

It was Bailey's former attorney, Roberts, who provoked the initial privilege discussion at an early stage by indicating his pretrial refusal to testify about communications with his former client absent a court order directing him to do so. This resulted in Bailey's initial statement that she was limiting her waiver of privilege to the Brazoria County charges, and Roberts sought clarification to ensure his clear understanding of the scope of waiver. Subsequently, Roberts was cross-examined about his former representation of Bailey, with the apparent defense strategy of discrediting the former attorney in an attempt to convince the jury that Bailey had a reasonable excuse for her failure to appear. Over the course of that cross-examination, the record reflects extensive continuing discussion about the privilege issue in multiple bench conferences outside the presence of the jury.

Under the pressures of a cross-examination that placed his professionalism at issue, Roberts continued to display an admirable sensitivity to respecting his former client's privilege. When the questioning about his client communications first veered away from the Brazoria County charges, it was again Roberts who provoked a careful consideration of how the cross-examination was unfolding. When asked how he knew that Bailey would not be coming to court for a hearing in Harris County (such that it was recited in the written motion he had brought with

him to court on the date of the hearing as a reason supporting his request to withdraw), Roberts suggested that counsel "might want to approach" the bench. The ensuing bench conference yielded no clarity with respect to the privilege, and Bailey's trial counsel asked the question again, specifically instructing the witness: "You can answer that." Roberts sought guidance from the trial judge, who stated "You may."

From that point, the cross-examination continued to erode Bailey's previously stated limitation on the scope of her consent, and Roberts continued to respond with caution. When probed about Bailey's level of "cooperation" with efforts to negotiate resolution of the various charges, Roberts expressed frustration that he didn't know what was being asked or how to answer. His continuing concern about respecting the privilege was acknowledged by defense counsel, who assured him: "We'll get through this. It's all out right now. The jury is going to hear about everything. Don't worry about the attorney-client. Everything has been waived at this point." The issue arose again when Roberts was cross-examined about his contractual arrangements with Bailey, and again he resisted questions about his client communications by stating it was "up to the client" whether she wanted to make their contract available as evidence.

The cross-examination further progressed into an exploration of communications about appearing for the Jefferson County proceedings, beginning

with an abstract acknowledgment of communications by text message, email, and phone conversation, which did not initially divulge the substance of those communications. Then, critically, the record indicates an "[o]ff-the-record discussion between attorney and defendant," immediately followed by questions eliciting the substance of "exactly" what Roberts communicated to Bailey by text and email. Roberts complied by reading the text of his email correspondence to Bailey. Defense counsel continued to probe further still by asking to see the actual documents. Roberts informed the judge that the documents reflected his handwritten notes, "which may be privileged." The prosecutor requested a discussion at the bench, and the record reflects that yet another off-the-record discussion occurred between Bailey and her trial counsel. Whatever was discussed, defense counsel then continued to pursue his line of cross-examination by reiterating his request to see Roberts's notes. For a reason not explained by the trial transcript, there then was a "(Pause)," and the trial judge excused the jury to once again address "the matter of the privilege" on the record. It was during this conference that Bailey spoke up again and re-asserted her previously expressed desire to "stick to the Brazoria County charge."

On appeal, Bailey attributes great significance to her trial lawyer's contemporaneous reaction, which she characterizes as "falling on his sword." But at the same time, Roberts expressed his exasperation, spontaneously stating: "I was

led to believe she did waive the privilege, which puts me in a precarious spot." The prosecutor—an interested party to be sure—added material color to the record by observing that Bailey's waiver "was very clear to everybody in the courtroom." The prosecutor stated that "the defendant was talking to her lawyer the entire trial," and this assertion is corroborated by the trial transcript which, as detailed above, is punctuated throughout the critical portions of the proceedings with indications of off-the-record consultation between Bailey and her trial counsel.

Thus, despite the on-the-record statements of Bailey and her trial counsel, there was a dispute in the courtroom about what had transpired off the record over the course of the cross-examination of Roberts. "[T]he totality of the circumstances and reasonable inferences therefrom may support a finding of waiver." *Carmona v. State*, 941 S.W.2d 949, 954 (Tex. Crim. App. 1997); *Wright v. State*, 374 S.W.3d 564, 579 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). Having witnessed all of these interactions, the trial judge ruled that Bailey had waived her privilege.

In sum, the trial record is conflicted and inadequately developed on the important question of whether Bailey waived her privilege as to conversations she had with Roberts regarding Jefferson County. While the record does contain some evidence that defense counsel exceeded the scope of Bailey's waiver of privilege, the evidence was disputed, the trial court concluded that the privilege had been waived, and it expressly so ruled. Like other evidentiary rulings, a trial court's

ruling determining that a privilege has been waived is reviewed for abuse of discretion, is upheld when it is within the zone of reasonable disagreement, and may not be reversed "solely because the appellate court disagrees with the decision." *Cameron v. State*, 241 S.W.3d 15, 19–20 (Tex. Crim. App. 2007).[4]

---

[4] The dissent reaches the opposite conclusion by accepting Bailey's and Sasser's statements as the conclusive facts concerning their communications, discounting the possibility that Bailey might have in fact authorized the line of questioning at issue, and drawing the firm conclusion that she did not waive her privilege. As noted above, the trial judge, who was in a better position in the courtroom to observe these events as they transpired, concluded otherwise, and the dissent does not contend that there was no evidence to support that conclusion. The case identified in the dissent, *Ex parte Varelas*, 45 S.W.3d 627 (Tex. Crim. App. 2001), provides no authority for overriding the trial judge's discretion as to this issue. Unlike Bailey's direct appeal, which comes to us without the benefit of a post-trial evidentiary hearing, *Varelas* was an appeal from the denial of a post-conviction application for a writ of habeas corpus. *Varelas*, 45 S.W.3d at 629. On the direct appeal in that case, the Court of Criminal Appeals had rejected the appellant's claim of ineffective assistance, noting the inadequacy of the record. *Id*. at 632 (citing *Varelas v. State*, No. 72,178, slip op. at 10–11 (Tex. Crim. App. Mar. 4, 1997) (not designated for publication)). The crucial *Varelas* affidavit was submitted after trial had concluded, in the context of the post-conviction habeas proceeding. On the particular facts of that case, the Court concluded that the trial court's finding that trial counsel had used sound trial strategy in not requesting a limiting instruction relating to evidence of the appellant's extraneous acts was "unsupported by the record." *Id*. at 632 n.5; *see also id*. at 646–47 (Holland, J., concurring in the denial of rehearing) ("I stand by the Court's opinion that there is no evidence in the record to suggest that the failure to request limiting instructions was the result of trial strategy."). *Varelas* thus involved a record that gave no support to the trial court's crucial factual finding in support of its ruling, and as such it is readily distinguishable from this direct appeal and its conflicted record relating to the waiver issue.

Under the circumstances of this record, we cannot conclude that the trial court abused its discretion in finding waiver based on the totality of the circumstances and the reasonable inferences therefrom, nor can we conclude that the record otherwise provides a firm foundation that affirmatively establishes that privileged testimony was elicited without Bailey's consent.

We hold that the record in this case does not conclusively establish that trial counsel's questions about Jefferson County were so outrageous that no reasonable attorney would have asked them. We draw this conclusion in light of the conflicting record with respect to the allegation of deficient performance, including the trial court's finding of waiver, as well as the context of the evident defense strategy in pursuing the line of questioning. We are also mindful that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective," *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003), and that has not yet happened in this case outside the context of trial counsel's active, ongoing representation of Bailey.[5] Finally, we have considered

---

[5] *See also State v. Thomas*, 428 S.W.3d 99, 106 (Tex. Crim. App. 2014) ("When counsel faces an ineffective-assistance claim, the attorney-client privilege is waived, and trial counsel has the opportunity to explain his actions."); *Bone*, 77 S.W.3d at 836 ("Under our system of justice, the criminal defendant is entitled to an opportunity to explain himself and present evidence on his behalf. His counsel should ordinarily be accorded an opportunity to explain her actions before being condemned as unprofessional and incompetent.").

other examples of alleged misconduct that the Court of Criminal Appeals has found insufficiently outrageous to support a finding of deficient performance in the absence of an explanation by counsel.[6]

Our holding is based solely on our consideration of the deficient-performance prong of *Strickland*. As the Court of Criminal Appeals has held, "The general doctrine that forbids an application for writ of habeas corpus after direct appeal has addressed the issue does not apply in these situations." *Thompson*, 9 S.W.3d at 814. As such, Bailey may resubmit her claim by way of an application for writ of habeas corpus. *Id.*; *see also Rylander*, 101 S.W.3d at 111 n.1; *Bone*, 77 S.W.3d at 837 n.30; *Varelas*, 45 S.W.3d at 629–30. "This would provide an opportunity to conduct a dedicated hearing to consider the facts, circumstances, and rationale behind counsel's actions . . . ." *Thompson*, 9 S.W.3d at 814. Should Bailey wish to pursue habeas corpus relief and should counsel be appointed to represent her, it would be her first opportunity as an indigent defendant to develop her claim of ineffective assistance of counsel at a hearing with the benefit of the assistance of counsel.

---

[6]    *See, e.g.*, *Menefield*, 363 S.W.3d at 592 (failure to object to an infringement of the client's right to confront witnesses); *Goodspeed*, 187 S.W.3d at 391 (failure to ask questions on voir dire); *Thompson*, 9 S.W.3d at 814 (failing to continue objecting to significant hearsay).

Although there is no constitutional right to appointment of counsel to pursue a writ of habeas corpus, *Ex parte Graves*, 70 S.W.3d 103, 110–11 (Tex. Crim. App. 2002), an indigent defendant may request appointment of counsel to seek a writ. The judges of county courts, statutory courts, and district courts trying criminal cases in each county are authorized to appoint counsel for indigent defendants in the county. TEX. CODE CRIM. PROC. ANN. art. 26.04(a), (b)(1) (West Supp. 2014). If the court concludes "that the interests of justice require representation," it must appoint counsel to aid the defendant in pursuing the writ. *See id.* art. 1.051(d). Under similar circumstances, this court once previously observed: "We cannot presume that the trial judge, if faced with a serious habeas petition and having legislative authority to appoint and compensate counsel, would decline to do so." *Muldrew v. State*, No. 01–86–00153–CR, 1987 WL 33896, at *4 (Tex. App.—Houston [1st Dist.] Dec. 31, 1987, pet. ref'd). Similarly here, we equally trust that a trial court judge having legislative authority to appoint and compensate counsel would not decline to appoint habeas counsel for an indigent defendant whose appellate counsel was appointed too late to take advantage of her only prior opportunity for an evidentiary hearing on her claim of ineffective assistance of counsel.

## II. Mistrial

Bailey argues that the trial court abused its discretion when it denied her motion for mistrial. She claims that Roberts's disclosure of privileged information was highly prejudicial, that no curative measures were taken by the court, and that the disclosure likely affected the jury's verdict.

The testimony of which Bailey complains was introduced by her own attorney. "[A] defendant may not complain of evidence elicited by his own attorney." *Ex parte Ewing*, 570 S.W.2d 941, 948 (Tex. Crim. App. [Panel Op.] 1978); *see also Durrough v. State*, 672 S.W.2d 860, 873 (Tex. App.—Corpus Christi 1984) ("A defendant may not complain of evidence elicited by his own attorney on cross-examination."), *remanded on other grounds*, 693 S.W.2d 404 (Tex. Crim. App. 1985). Therefore, the trial court did not abuse its discretion in refusing to grant a mistrial. Bailey's second issue is overruled.

## Conclusion

We affirm the judgment of the trial court.


                                        Michael Massengale
                                        Justice

Panel consists of Chief Justice Radack, Justice Massengale, and Justice Huddle.

Chief Justice Radack, dissenting.

Publish. TEX. R. APP. P. 47.2(b).